**NATIONAL TELEINFORMATION NETWORK, INC., a foreign corporation, Plaintiff,**

v.

**MICHIGAN PUBLIC SERVICE COMMISSION, a Michigan public agency; and Michigan Bell Telephone Company, a Michigan corporation, Defendants.**

**No. G86–364.**

United States District Court, W.D. Michigan, S.D.

May 31, 1988.

Justin C. Ravitz, Marc A. Goldman of Sommers, Schwartz, Silver & Schwartz, Southfield, Mich., for plaintiff.

Frank J. Kelly, Atty. Gen. of Mich., Don L. Keskey, Elizabeth R. Schwartz, Lansing, Mich., for Michigan Public Service Com'n.

James K. Robinson, I.W. Winsten, Detroit, Mich., for Michigan Bell.

## OPINION

BELL, District Judge.

Before this Court is the motion of Defendant, Michigan Public Service Commission (MPSC), to dismiss the verified complaint of Plaintiff, National Teleinformation Network (NTN), which seeks an injunction compelling the MPSC and Defendant, Michigan Bell Telephone Company (Michigan Bell), to provide NTN with access to Michigan Bell's multi-caller recorded program service allowing NTN to disseminate its sexually explicit messages until the MPSC duly promulgates rules limiting access to minors in the least restrictive manner.

## BACKGROUND

Plaintiff, NTN, is a California corporation providing sexually explicit recorded messages via telephone. Defendant, MPSC, is the State of Michigan agency that regulates public utilities, including telephone companies. Defendant, Michigan Bell, is a Michigan corporation operating as a telephone carrier.

On December 8, 1983, Michigan Bell requested the MPSC to revise Tariff MPSC No. 2 to permit a community information service. A community information service or sponsored program service allows simultaneous multiparty access to pre-recorded messages. On November 26, 1985, the MPSC revised operating Tariff MPSC No. 2 to permit sponsored program services. (See MPSC Opinion and Order in cases U–7851 and U–7926.)

The MPSC's revision adopted an amended FCC access code regulation, 47 CFR § 64.201, permitting pre-recorded sexually explicit interstate messages only if the user provided an authorized access code before receiving the message. The prior unamended regulation temporally relegated service availability to the interval between 9:00 p.m. and 8:00 a.m. This regulation was successfully challenged under the First Amendment in *Carlin Communications v. F.C.C.*, 749 F.2d 113 (2nd Cir.1984). The amended FCC regulation adopted in Tariff MPSC No. 2 was challenged in *Carlin Communications v. F.C.C.*, 787 F.2d 846 (2nd Cir.1986), under the First Amendment. The court set the regulation aside as to the plaintiffs before that court and remanded the regulation to the FCC to evaluate consumer blocking technology as the least restrictive means of denying telecommunication access to minors of sexually explicit messages.

On April 29, 1986, NTN contracted with Michigan Bell to provide NTN sponsored messages on Michigan Bell's sponsored program service. However, the agreement required NTN to comply with Tariff MPSC No. 2 embodying the FCC access code requirement in providing its sexually explicit sponsored messages. NTN claims that the access code requirement technologically and economically prohibits delivery of its sponsored messages. NTN claims that the access code requirement is not the least restrictive means to prohibit minors from receiving its sexually explicit sponsored messages.

On May 23, 1986, NTN filed this suit against MPSC and Michigan Bell alleging that: (1) Michigan Bell breached its contract with NTN by refusing NTN to provide its sexually explicit sponsored messages without complying with the access code requirement of Tariff MPSC No. 2, (2) MPSC violated NTN's free speech and privacy rights by requiring an access code in Michigan Bell's operating Tariff MPSC No. 2., and (3) Tariff MPSC No. 2 is invalid under Michigan law because of the *Carlin* decisions, *supra,* and constitutes an improper delegation of legislative, rulemaking, and enforcement authority.

## ANALYSIS

Defendant MPSC has filed a motion to dismiss NTN's action because: (1) this Court lacks jurisdiction to review this case under the Federal Communications Act of 1934 (FCA), 47 U.S.C. §§ 151 *et seq.* and the Johnson Act, 28 U.S.C. § 1342, and (2) principles of abstention, comity, and exhaustion of remedies require dismissal. Also, defendants claim that the contract claim against Michigan Bell should be dismissed as frivolous.

### Jurisdiction Under the Federal Communication Act of 1934

Telecommunication services are subject to dual jurisdictional regulation. The FCA, §§ 2(a) and (b), 47 U.S.C. §§ 152(a) and (b), specify a dual jurisdictional scheme of regulation. Section 152(a) grants jurisdiction to the Federal Communications Commission (FCC) over interstate and foreign telecommunications. Section 152(b) grants to the individual states jurisdiction to regulate intrastate telecommunication:

> Except as provided in section 224 of this title and subject to the provisions of section 301 of this title and subchapter V–A of this chapter, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier.

In *Louisiana Public Service Commission v. Federal Communication Commission,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) the Court acknowledged this dual jurisdictional scheme in holding that the FCC regulation did not preempt state regulation of intrastate telecommunication:

> The Act establishes, among other things, a system of dual state and federal regulation over telephone service, and it is the nature of that division of authority that these cases are about. In broad terms, the Act grants to the FCC the authority to regulate "interstate and foreign commerce in wire and radio communication,"

47 USC § 151 [47 USCS § 151], while expressly denying that agency "jurisdiction with respect to ... intrastate communication service...." 47 USC § 152(b) [47 USCS § 152(b)].

476 U.S. at 360, 106 S.Ct. at 1894, 90 L.Ed. 2d at 376.

The Federal Rules of Appellate Procedure 15(b) and 28 U.S.C. § 2342 provide for review of FCC regulation of interstate telecommunication in a federal *appellate* court. No provision exists for FCC or federal judicial review of state regulated *intrastate* telecommunications.

The MPSC regulates intrastate telecommunications pursuant to Michigan Public Service Commission Act, 1939 P.A. 3, M.C. L. § 460.1 *et seq.*; M.S.A. § 22.13(1). Regulatory tariffs are promulgated under the Michigan Administrative Procedures Act, 1969 P.A. 306, M.C.L. §§ 24.201 *et seq.*; M.S.A. §§ 3.560(101) *et seq.* The MPSC exercises plenary regulatory jurisdiction of intrastate telecommunication. Appellate review of an MPSC order is available in the state appellate courts pursuant to M.C.L. § 462.26; M.S.A. § 22.45.

This Court is cognizant of no specific grant of jurisdiction to federal district courts to review rate affecting regulatory orders of state public service commissions regarding intrastate telecommunications. By establishing a dual jurisdictional scheme and affirmatively providing only for federal judicial appellate review of FCC regulation of interstate telecommunication this Court determines that Congress intended that the federal judicial review should not intrude into state utility regulatory proceedings.

Moreover, this Court recognizes Congress' explicit statutory creation of a dual jurisdictional scheme and acknowledges that constitutional challenges are totally and properly cognizable in state court. Consequently this Court determines that NTN's mere constitutional challenge to the tariff does not automatically create appropriate subject matter jurisdiction for this Court. Constitutional challenges to a MPSC tariff are totally and properly cogni-

zable in a state judicial review of the MPSC's administrative action.

*The Johnson Act, 28 U.S.C. § 1342*

█ Under the Johnson Act federal district courts are not permitted to injunctively interfere with a state administrative regulatory order affecting rates under specified conditions. The Johnson Act specifically provides:

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a ratemaking body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342.

In *California v. Grace Brethren Church*, 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982) the Court explicated Congress' intent in passing the Johnson Act by excerpting from the act's legislative hearing.

The legislative history of the Johnson Act, in turn, makes clear that its purpose was to prevent public utilities from going to federal district court to challenge state administrative orders or avoid state administrative and judicial proceedings. See, e.g., S Rep No. 125, 73d Cong. 1st Sess, 3 (1933) (in support of the Johnson bill, declaring that a utility "will be required, in all cases where a State has set up a public utility commission, to proceed before that commission if it has any complaint. It can appeal from this State board to the State courts and, if it is dissatisfied with the final judgment of the supreme court of the State, it can take an appeal to the Supreme Court of the United States") id., at 33 ("It is the

jurisdiction which Congress has given to Federal courts to pass on matters of State regulation which holds up the laws of the States, prevents the officials of the States from doing their duty, and robs the people of the benefit which would accrue to them, if the commissions which they have set up by law in the various States were permitted to perform their duty"); HR Rep No. 1194, 73d Cong, 2d Sess, 2 (1934) (in opposition to the Johnson bill, declaring that it "seeks to withdraw completely from the district courts of the United States all jurisdiction in suits relating to orders of State administrative boards or commissions affecting rates chargeable by public utilities"); 78 Cong Rec 1916 (1934) (remarks of Sen. Johnson); id., at 1918 ("the object is to make [the utilities] subject to the jurisdiction of the laws of our States; to give them their rights in every instance to the trial of the question of fact first before the public-utility commission, to give them every legal right they have, and if any right that is guaranteed by the Constitution is infringed upon at all, then, of course, the legal right of appeal ultimately from the highest tribunal in the State to the United States Supreme Court"); id., at 8324 (remarks of Rep. Mapes) ("It is simply a question as to whether or not States are going to be allowed to perform their proper functions in the supervision and fixing of rates, without interference of Federal law. It is a question as to whether or not Congress is going to continue to permit the utilities in important cases to thwart the will of the States and the State authorities.... This bill will only deprive the lower Federal courts of the jurisdiction they now have over rate cases"); id., at 8328 (remarks of Rep. Lewis) ("The Johnson bill absolutely abolishes the jurisdiction of the United States courts in rate cases"); id., a 8338 (remarks of Rep. Tarver) ("The Johnson bill contains but one substantive proposition, and that is to divest the district courts of the United States of jurisdiction in public-utility rate cases"); id., at 8419 (remarks of Rep. Hancock) ("the Johnson bill seeks to [save time and money] by divesting the Federal courts of all jurisdiction in public-utility cases except the right of appeal to the Supreme Court of the United States after the final decision of the state court of last resort").

*Grace Brethren*, at 409, f.n. 22, 102 S.Ct. at 2508–09 f.n. 22. Congress manifestly intended to circumscribe the jurisdiction of federal district courts over state administrative public utility rate regulations.

The litigants dispute the applicable scope of the Johnson Act. NTN argues that the Johnson Act does not properly apply to them because the act only prevents federal district courts from interfering with "any order affecting rates." NTN asserts that it does not contest the tariff's rate, but rather challenges the constitutionality of the tariff's access code requirement. Thus, NTN concludes that the Johnson Act does not apply to the facts of the present dispute. Defendants counter by asserting that the text of the Johnson Act and the expansive language of its legislative history do not limit applicability of the Johnson Act to rate cases.

This Court notes that the Johnson Act specifically prevents a federal district court from enjoining, suspending, or restraining "any order affecting rates" where four additional specified conditions exist. The context of the phrase, "any order affecting rates," does not contemplate any subdivision of a rate affecting *order* into constituent rate and nonrate elements. Textually the statute simply prevents a federal district court from injunctively acting on a "rate affecting order." The plain meaning of the phrase does not suggest or admit any partitioning construction, but rather simply comprehends an order. If Congress had intended to permit federal district courts to dissect state administrative rate affecting orders and injunctively operate only upon the rate affecting aspects, then Congress would have done so. But, Congress did not do so. Consequently, the Johnson Act's prohibition of district court injunctive action on such an order is not properly to be selectively applied to only the elements of an order that affect rates.

Thus, the Johnson Act entirely prohibits district court injunctive action on "any order affecting rates" and not merely on elements of an order insofar as the individual elements affect rates. This Court does not consider this to be an absurd or illogical construction of the statute. *See Grace Brethren, supra.* In *Tennyson v. Gas Service Co.,* 506 F.2d 1135 (10th Cir.1974), the court commented on the scope and purpose of the Johnson Act:

> [B]y its [the Johnson Act] broad wording it is clear that it was intended to keep *constitutional challenges* to orders affecting rates out of the federal courts lock, stock and barrel, or as Professor Moore succinctly puts it, to effect a general hands-off policy relative to state ratemaking. IA J. Moore, Federal Practice 0.206 at 2282 (1974). The Act is not framed in terms of categories of plaintiffs, whether municipalities, state commission, utilities, or consumers but in terms of enumerated conditions. Behind the Act were years of hostilities generated from jurisdiction in both state and federal systems, removal of which was deemed desirable to the national policy. Thus the restriction imposed was far-reaching, going to jurisdiction itself. Should it be thought desirable to resurrect the Federal jurisdiction in favor of any particular class or group, such is a matter for the Congress, not for this court.

*Tennyson,* at 1135.

In the present case the disputed Tariff MPSC No. 2 affects rates. The tariff specifically provides for rates and charges in section A. 3., entitled, "Rates and Charges." Further, no genuine issue of material fact exists that the circumstances of the present dispute satisfy the Johnson Act's four additional requirements, specifically being: (1) jurisdiction based solely on diversity or claimed repugnance of the order to the United States Constitution, (2) the contested intrastate regulatory order does not affect interstate telecommunication, (3) the order arising out of MPSC cases U–7851 and U–7926 was made after reasonable notice and hearing, and (4) a plain, speedy, and efficient remedy may be had in an appropriate state court. *See* the Michigan Public Service Commission Act, the Public Utilities Act, and the Michigan Telephone Act. M.C.L. § 462.26; M.S.A. § 22.45.

Accordingly under the Johnson Act this Court determines that it has no subject matter jurisdiction to entertain this case.

## Abstention, Comity, and Exhaustion of Remedies

Defendants urge this Court to dismiss this action based upon principles of abstention, comity, and exhaustion of remedies. NTN contends that such principles do not require this Court to decline jurisdiction of this matter. Further, NTN argues that where, as here, a constitutional overbreadth challenge is raised against a state enactment, abstention is disfavored. *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

This Court notes that in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the Court found abstention proper where a state adjudicatory process possesses superior expertise to adjudicate a dispute which significantly involves matters of primarily and traditionally state administrative interest. *See Colorado River Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). *Construction Aggregates Corp. v. Rivera de Vicenty,* 573 F.2d 86 (1st Cir.1978), *Smith v. Metro Property & Liability, Inc.,* 629 F.2d 757 (2nd Cir. 1980). The court in *Vicenty, supra,* described this type of abstention:

> [T]his type of abstention calls for surrender of federal jurisdiction, not its mere postponement; and there need be present neither a constitutional issue nor a difficult and unresolved question of state law. [citation omitted] It is not necessary that there be a collateral ongoing proceeding in state court. [citation omitted] Rather, under the *Burford* -type abstention, the federal courts defer primarily because of the nature of the state regulatory interest in a particular subject matter and the potential for intervention.

*Vicenty,* at 90.

In the present case this Court hesitates to predicate a constitutional analysis and

decision on access code technology as the least restrictive means preventing availability to minors, when this Court lacks the technical facilities and expertise to properly assess the feasibility and efficacy of such technology. In such circumstances this Court properly commends the dispute to the competence, expertise, and sophistication of the state agency designated to evaluate the technology and to the review of the state adjudicatory process.

Furthermore, this Court acknowledges the applicability of *Pullman* type abstention. *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The *Pullman* type abstention arises where federal jurisdiction is invoked for a constitutional challenge to a state statute or administrative order and construction of unsettled but relevant state law by the state adjudicatory process would obviate a constitutional decision or alter the nature of the constitutional issue. Unsettled question of law exist. For example, NTN claims that the MPSC operates by an improper delegation of state legislative authority. Also, the status and efficacy of access code technology as the least restrictive means of denying minors access to NTN's sexually explicit sponsored program service is unsettled and, consequently, does not provide a propitious basis on which this Court should presently predicate a constitutional determination.

In the present case this Court determines that abstention will avoid needless obstructive intrusion of the federal court into the domestic policies of the state. Abstention will promote felicitous comity between the federal and state judiciary by recognizing the legitimate and significant regulatory interests of the state and the ready availability for state court adjudication of any attendant constitutional claims.

This Court also believes that abstention will promote judicial economy. An experienced and sophisticated state administrative mechanism to regulate telecommunication and adjudicate disputes already exists with fully functional judicial review safeguards. This Court determines that the litigants in this case should use it.

Furthermore, this Court does not find that NTN has fully exhausted the remedies provided by the State of Michigan. This Court recognizes that the State of Michigan maintains a significant interest in its public service utility regulation and has developed extensive expertise in the factual and legal analysis of such utility regulation as a traditional exercise of its police power. Additionally, this Court acknowledges the state's legitimate need and duty to uniformly regulate all of Michigan's telephone companies. However, there is no genuine issue that NTN has not proceeded through the duly authorized state administrative procedures. NTN should file its claim with the appropriate state agency and raise its constitutional claims, if needed, in subsequent state judicial review as provided in the Public Service Commission Act. M.C.L. § 462.26; M.S.A. § 22.45.

In *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952), plaintiff sought a declaratory judgment arguing that the state agency was interfering with interstate commerce and that plaintiff was consequently not subject to the state regulation. Although *Wycoff* did not involve an overbreadth challenge, it did involve a constitutional challenge. Still, the Supreme Court affirmed the primacy of the state administrative process, reasoning:

"Even when there is no incipient federal-state conflict, the declaratory judgment procedure will not be used to pre-empt and prejudge issues that are committed for initial decision to an administrative body or special tribunal any more than it will be used as a substitute for statutory methods of review. It would not be tolerable, for example, that declaratory judgments establish that an enterprise is not in interstate commerce in order to forestall proceedings by the National Labor Relations Board, the Interstate Commerce Commission or many agencies that are authorized to try and decide such an issue in the first instance. Cf. *Myers v Bethlehem Shipbuilding Corp.*, 303 US 41, 82 L Ed 638, 58 S Ct 459; *Eccles v Peoples Bank*, 333 US 426, 92 L Ed 784,

68 S Ct 641. See *Colegrove v Green*, 328 US 549, 90 L Ed 1432, 66 S Ct 1198. Responsibility for effective functioning of the administrative process cannot be thus transferred from the bodies in which Congress has placed it to the courts.

But, as the declaratory proceeding is here invoked, it is even less appropriate because, in addition to foreclosing an administrative body, it is incompatible with a proper federal-state relationship. The carrier being in some disagreement with the State Commission, rushed into federal court to get a declaration which either is intended in ways not disclosed to tie the Commission's hands before it can act or it has no purpose at all.

Declaratory proceedings in the federal courts against state officials must be decided with regard for the implications of our federal system. State administrative bodies have the initial right to reduce the general policies of state regulatory statutes into concrete orders and the primary right to take evidence and make findings of fact. It is the state courts which have the first and the last word as to the meaning of state statutes and whether a particular order is within the legislative terms of reference so as to make it the action of the State. We have disapproved anticipatory declarations as to state regulatory statutes, even where the case originated in and was entertained by courts of the State affected. *Alabama State Federation of Labor v McAdory*, 325 US 450, 89 L Ed 1725, 65 S Ct 1384."

*Wycoff*, at 246–247, 73 S.Ct. at 241–242.

*NTN's Contract Claim*

 NTN agreed to comply with the access code provisions of the tariff when NTN contracted with Michigan Bell to provide a sexually explicit sponsored program service. Defendants move to dismiss NTN's contract claim as frivolous. NTN claims that Michigan Bell is now breaching the contract by not allowing NTN to purvey its sponsored program service without an access code.

NTN and Michigan Bell entered into a contract with an access code provision pursuant to Tariff MPSC No. 2 after the contested FCC and MPSC orders were promulgated and the *Carlin* cases were decided. Still, NTN has not complied with the access code provision. Instead NTN filed suit attacking the access code required by the MPSC to be unconstitutional. However, NTN expressly conditioned its ability to purvey its sponsored program service in its agreement with Michigan Bell on compliance with Tariff MPSC No. 2.

If Michigan Bell were to allow NTN to provide sponsored program service without an access code, then Michigan Bell would violate the terms of the operating tariff by which the MPSC permitted Michigan Bell to carry sexually explicit sponsored program services. Michigan Bell could not violate the explicit terms of the tariff without exposing itself to sanctions by the MPSC.

NTN's failure to comply with the access code provisions of the tariff, excuses Michigan Bell's contractual obligation to facilitate the sponsored program service. This Court determines that NTN may not sue Michigan Bell for Michigan Bell's failure to carry NTN's sponsored program service when NTN initially failed to comply with an explicit contract term to which it had agreed. *Baith v. Knapp-Stiles, Inc.*, 380 Mich. 119, 156 N.W.2d 575 (1968), *Flamm v. Scherer*, 40 Mich.App. 1, 198 N.W.2d 702 (1972).

CONCLUSION

In accordance with the preceding analysis this Court grants defendant MPSC's motion to dismiss plaintiff NTN's complaint because: (1) this Court lacks jurisdiction under the Johnson Act and the Federal Communication Act of 1934, and (2) abstention by this Court is most appropriate under the circumstances of this case. Further, the NTN's contract claim against Michigan Bell is dismissed because Michigan Bell's contractual obligation to facilitate NTN's sponsored program service is excused by NTN's failure to comply with the required access code term of the tariff

under which both Michigan Bell and NTN must operate.