**LITTLE CAESAR ENTERPRISES, INC., a Michigan corporation, et al., Plaintiffs,**

v.

**R–J–L FOODS, INC., a Michigan corporation, et al., Defendants.**

**Civ. A. No. 92–CV–71185–DT.**

United States District Court, E.D. Michigan, S.D.

April 2, 1992.

Alan C. Harnisch, Bingham Farms, Mich., for plaintiffs.

David Hess, Warren, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

EDMUNDS, District Judge.

### I.

This matter is before the Court on Plaintiffs' motion for a preliminary injunction and Defendants' motion for a temporary restraining order (TRO) and/or preliminary injunction. Having heard arguments of counsel, and upon consideration of the parties pleadings and written submissions, the Court hereby grants Plaintiffs' motion and denies Defendants' motion.

Plaintiff Little Caesar Enterprises (LCE) operates and grants franchises for pizza stores and restaurants. The grant of a franchise authorizes the franchisee to use various licensed rights; including the name "Little Caesar" and other registered trademarks, service marks, trade names, logos, commercial symbols and copyrights developed by LCE.

Defendants/Counter–Plaintiffs R–J–L Foods (RJL) and the other named Defen-

dants (hereafter Defendants or RJL Franchisees), currently own and operate ten "Little Caesar" stores in the state of Connecticut. Defendants purchased a total of thirteen stores from 1987 to 1991. Three of the franchises are no longer active. The franchise agreements[1] between Plaintiffs and Defendants contain forum selection and choice of law provisions which provide that Michigan courts and Michigan law applies in disputes such as the one presently before the Court. Under the franchise agreements, Defendants acquired the right to use the licensed rights in connection with the advertising and sale of pizza and related food products of LCE. Among Defendants' obligations were the requirements that Defendants operate the franchises in conformance with required product specifications; and to pay royalty, product, and advertising fees. The franchise agreements further required the franchise owner to pay its debts in a timely manner.

In late 1989/early 1990 LCE, through THE LITTLE CAESARS NATIONAL ADVERTISING PROGRAM (LCNAP), the other plaintiff in this case, commenced a new national advertising strategy for special or promotional products which included nationally advertised prices. LCNAP advertised in what Defendants describe as the RJL Franchisees "Area of Dominant Market Influence" (ADI) in Connecticut. Defendants conformed for a short time to LCE and LCNAP's first product and price promotion. Defendants claim that they suffered customer complaints due to the poor quality of the promotional goods, which they allege are inferior to LCE's standard products. The franchise owners further contend that they realized that they could not sell the allegedly inferior promotional products without suffering a loss of goodwill. RJL Franchisees therefore asked LCE to be exempted from the national advertising; or in the alternative, that the advertisements disclose to the customers that the "promotional" items were of lesser quality than LCE's standard goods.

LCE apparently denied these requests. Defendants also requested that disclaimers be placed on the advertisements disclosing that the promotional items were not available in Connecticut at the price stated, such as was being done in Alaska and Hawaii. This request also was denied.

Defendants therefore decided to exercise their option under the franchise agreements to determine prices. (*See* Franchise Agreement § VIII). For some period of time, their prices exceeded the nationally advertised price.

On October 8, 1991 LCE notified the RJL Franchisees of its intent to terminate the franchise agreements for allegedly:

1. failing to file required royalty reports;

2. failing to pay royalty fees;

3. failing to pay advertising fees;

4. failing to pay its debts in a timely manner; and

5. failing to operate in conformance with required product specifications.

(*See* October 8, 1991 letter from LCE, Charles P. Jones, Vice Chairman, attached as Exhibit G to the Verified Complaint). The franchise agreements provide that the effective date of termination is thirty day from the franchise owner's receipt of the Notice. (*See* Franchise Agreement § XIX).

On November 14, 1991, the RJL Franchisees informed LCE of their intent to cure all arrearages. (*See* November 14, 1991 letter from RJL counsel, Philip G. Jameson, attached as Exhibit 1 to Plaintiffs' Brief). That letter states in full:

I am writing to you regarding Mary Jo Teel's letter to RJL Foods, Inc., dated November 6, 1991.

Many of the operational modifications suggested by LCE at the October 29, 1992, meeting have been put into place. However, there are a number of items which are yet to be addressed. Specifically, we would like to move forward without further delay with Mike Shaub's

---

**1.** For ease of reference, all citations to specific provisions in the franchise agreements (which the parties concede are the same for purposes of these motions) will be to the Franchise Agreement (Franchise Agreement) attached to Defendants' Brief in Support of Motion for TRO and/or Preliminary Injunction.

suggestion that he speak with our Landlords in an attempt to lower our rental obligations and in abolishing RJL's present manager's bonus program in favor of LCE's.

The marketing people have met in Connecticut and have agreed that the advertising budget has been slashed to the bone and that the current vehicles being used are correct given the current availability. The only issue to be addressed is attempting to lower the assertion rate which Mike Deitz will be addressing shortly.

As for Mary Jo Teel's letter, Rich Cueny and I will be speaking shortly to finalize negotiations to cure the present arrearages. It is my understanding that Mr. Cueny and Frank Lombardo have been addressing this issue and have finalized the amounts due.

I am under the impression from our last conversation that so long as we are making continuous and regular progress with regard to curing the arrearages that LCE will not take any definitive action to terminate our franchise and will us allow ample time to resolve this issue.

RJL sincerely appreciates all of the efforts that LCE has made and we hope that we will be able to move forward in this continuing spirit of cooperation.

Subsequently, Defendants requested an extension until December 16, 1991, (*see* Exhibit H to the Verified Complaint); which LCE granted. Defendants failed to cure on that date. Furthermore, the RJL Franchisees then informed LCE that although Defendants intended to make their food account current, they did not intend to pay their royalty or advertising accounts at that time. (*See* December 10, 1991 letter from Anthony J. Caputo, attached as Exhibit 2 to Plaintiffs' Brief). After continued attempts to work out a plan for curing the default were unsuccessful, LCE terminated Defendants' franchise agreements and all licensed rights on March 4, 1992.

Defendants concede that they are in arrears but contend that the termination is in reality an attempt to "bring them back into line" for refusing to participate in the marketing scheme. The RJL Franchisees refer to a letter sent by LCE to the RJL Franchisees which Defendants allege "ma[kes] clear that they had a limited future with LCE. (*See* September 17, 1991 letter from Mike Shaub, Regional Vice President, Northeast Franchise Development of LCE, to Frank Lombardo). This letter of course precedes the meetings and discussions in October and November where the defendant franchisees acknowledged the problem of their arrearages and expressed their appreciation with LCE's patience in working with them to cure the problem. In further support of this argument, Defendants point out that their termination immediately followed the election of Philip G. Jameson, an attorney and one of the RJL Franchisees, to the Board of Directors of the newly formed Association of Little Caesar's Franchisees, Inc.

In their motion for preliminary injunction, Plaintiffs request that this Court:

1. enjoin Defendants from using the "Little Caesar" name, trademarks, service marks, insignias or logos or any word or words confusingly similar to the licensed rights; from competing with LCE for a two year period after the effective date of terminations provided under section XVII. C. 3 of the Franchise Agreement; and diverting or attempting to divert any business or customer of LCE in accordance with section XVII. C. 1;

2. issue a mandatory injunction against Defendants, ordering them to remove immediately any and all indicia of the "Little Caesar" name and other registered trademarks and service marks; and further requiring Defendants to present an affidavit to the Court within thirty days of the order indicating any and all efforts taken to comply with the Court's order.

In contrast, Defendants seek a TRO and/or preliminary injunction ordering in principal part that:

1. the franchise agreements remain in full force and effect during the pendency of this matter;

2. LCE sell to RJL Franchisees food and trademark supplies from its affiliate Blue Line Distributing, Inc. under its standard terms previously extended To Defendants prior to the March 4, 1992 termination; and

3. LCE and LCNAP are restrained from placing within RJL's Franchisees' ADI any television, radio, or printed advertisements which promote any specific product or products of different specifications than the standard LCE specifications.

## II.

 Both parties have brought motions for a preliminary injunction. A court must consider four factors in deciding whether to issue a preliminary injunction:

1. whether the movant has shown a strong or substantial likelihood of success on the merits;

2. whether the movant has demonstrated irreparable injury;

3. whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. whether the public interest is served by the issuance of an injunction.

*Parker v. United States Dep't. of Agric.*, 879 F.2d 1362, 1367 (6th Cir.1989). The foregoing are factors to be balanced, not prerequisites to be met. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Where the three factors other than the likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary injunction if the merits present a sufficiently serious question to justify a further investigation. *Id.* at 1230. *See also Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982). Alternatively, the court may also issue a preliminary injunction if the movant "at least shows serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Frisch's Restaurant, Inc., v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir.1985) (citations omitted).

### A. *Likelihood of Success*

 The first factor for an issuance of an injunction is whether the moving party is likely to succeed on the merits of his/her claim. In the instant case Plaintiffs have filed a Verified Complaint and Defendants have filed a Verified Counter–Complaint and Amended Verified Counter–Complaint. At the hearing conducted on Tuesday, March 24, 1992, both sides indicated that they were willing to stand on their pleadings unless the Court desired further testimony. The Court will therefore treat all allegations as true for purposes of deciding the motions before it today. Additionally, since both parties seek injunctive relief, both are movants in this case and must have met their burden of proof before the Court will grant the relief requested.

Plaintiffs' request for a preliminary injunction is based upon the fact the RJL Franchisees have continued to use the "Little Caesar" name and other licensed rights even though they have been terminated, in violation of Franchise Agreement section XIX. C. 2. The section provides in pertinent part that "[u]pon termination or expiration of this Agreement, Franchise Owner shall immediately cease to be a licensee of LITTLE CAESAR and ... [f]ranchise owner must [ ] cease using the name LITTLE CAESAR and other PROPRIETARY MARKS...." Plaintiffs claim that they rightfully terminated Defendant Franchisees for failing to pay royalty, advertising and product fees in a timely manner as is required under section XIX. B. of the Franchise Agreements. Thus, Plaintiffs assert that RJL's continued use of the "Little Caesar" name constitutes infringement under 15 U.S.C. §§ 1114 and 1125(a). The case law is clear that the unauthorized use of a registered trademark is a violation of the federal trademark statutes. Thus the Court agrees that Plaintiffs meet their burden for a preliminary injunction if it is established that the use was unauthorized. The Court will therefore devote most of its energy to Defendants' argument, because the Court feels that the issue in this case turns on the contract issue raised by Defendants.

As noted, Defendants concede that they are in arrears on the required payments but contend that they were essentially forced into breach by LCE and LCNAP's advertising and pricing policies and by Plaintiffs' coercive conduct of requiring them to participate in the national advertising program. Furthermore, Defendants contend that this coercive conduct by Plaintiffs constituted a violation of the franchise agreements; specifically the "Pricing Policy" provision of the contracts, under section VIII, which provides in relevant part that "[t]he final decision as to all such manner of pricing however shall be made solely by Franchise Owner;" and section VI. D. 3, which states that it is the franchise owner's option "to display promotional signs or other written materials or participate in other promotions, in the manner, from which time to time may be provided by LITTLE CAESAR...." (*See* Franchise Agreement, at §§ VIII; VI. D. 3).

In legal support for the argument that a preliminary injunction should issue in their favor, Defendants rely on the principle that "[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform;" citing *Jones v. Berkey*, 181 Mich. 472, 148 N.W. 375 (1914); and *Ehlinger v. Bodi Lake Lumber Co.*, 324 Mich. 77, 89, 36 N.W.2d 311 (1949). Defendants also observe correctly that the principle is applicable only when the breach is substantial and offer the following quote from *McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 574, 127 N.W.2d 340 (1964):

> [T]he words "substantial breach" in the ruling must be given close scrutiny. Such scrutiny discloses that the application of such rule can be found only in cases where the breach has effected such change in the essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as causing a complete failure of consideration or the prevention of performance by the other party.

*Id.* (citations omitted). *See also National Teleinformation Network, Inc. v. Michigan Public Service Comm'n.*, 687 F.Supp. 330, 337 (W.D.Mich.1988) (relying on *McCarty*, the federal district court held that NTN was precluded from suing Michigan Bell for the latter's failure to carry NTN's sponsored program service where NTN was the first party to fail to comply with an explicit agreed-upon contract term).

Defendants assert that LCE and LCNAP's activities and conduct with regard to the national advertising strategy, namely the price point national advertising, constitutes the initial substantial breach in this case since LCE did not reserve to itself in the franchise agreements even a right to suggest pricing. Rather, Defendants point to language in the Pricing Policy of the franchise agreements which provides that "LITTLE CAESAR may, *UPON REQUEST*, provide the Franchise Owner with information for its *CONSIDERATION* in establishing prices for the food products advertised, sold and offered for sale by Franchise Owner;" and that "*UPON REQUEST* of Franchise Owner, LITTLE CAESAR shall advise it of menu price variation...." (Emphasis added by Defendants). To demonstrate that the breach was substantial, Defendants allege that they could not remain solvent at the promotional prices since customers demanded the television advertised promotional product at the television price; while at the same time expecting the quality of pizzas to be that of the standard, as opposed to the promotional, pizza. Defendants state that they lost money attempting to meet both demands.

Defendants' argument is not without some force. The Court finds however on the basis of the facts set forth in Defendants' brief, motion and Amended Verified Counter–Complaint, that it is Defendants themselves who committed the initial substantial breach in this case by repeatedly failing to make royalty, advertising and product payments to Plaintiffs. The Affidavit of Richard T. Cueny, Vice–President of Finance and Internal Control of LCE, states that Defendants have outstanding royalty fees due to LCE since July 1, 1991; outstanding advertising fees due to LCNAP since June 1, 1991; and outstand-

ing food product fees owed to Blue Line Distributing, Inc., more than fourteen days, which is its due date. (*See* Cueny Affidavit at ¶¶ 3–7). Furthermore, and of particular importance here, Defendants have conceded at oral argument on March 24, 1992 and in their brief that they have been in arrears on at least their royalty and LCNAP payments since their inception, that is, since 1987. (Defendants' Brief at 6). In fact, Defendants rely on that fact in arguing that issuance of an injunction in their favor would cause no harm to others, including Plaintiffs, since that has been the state of affairs for a long time. Thus it appears that Defendants have been in continuous default under the franchise agreement for a period exceeding four years, while the earliest date on which LCE is alleged to have breached the agreement would be some time in early 1990, when LCE allegedly first advertised in Defendants Area of Dominant Market Influence without the RJL Franchisees' consent. That is, the first significant breach is that of Defendants, not Plaintiffs. Moreover, based on the exhibits which were attached to the verified pleadings, Plaintiff LCE appears to have made substantial efforts to work with Defendants in reducing the amounts in arrears. As late as November 1991, Defendants were thanking LCE for its patience and assistance, and were not complaining about LCE's conduct as having caused the breach.

Although Defendants attempt to make some sort of estoppel argument in that LCE has repeatedly allowed them the opportunity to cure, the non-waiver clause in the franchise agreement destroys that argument. That provision states:

## XX. NON–WAIVER

A failure by LITTLE CAESAR to exercise any right hereunder or otherwise waive or condone any delay or failure by Franchise Owner to comply with any of the terms or conditions of this Agreement, shall not constitute a waiver of any such requirements or provisions, waive LITTLE CAESAR's right to terminate this Agreement, or exercise any other right of LITTLE CAESAR under this Agreement.

■ Having said all that, there is a more fundamental legal reason, based on contract principles why Defendants cannot prevail on this argument. The fact that LCE may have breached the agreement does not entitle Defendants to breach themselves by not making royalty, advertising and supply payments. Defendants' failure to make those payments constitutes an independent breach, and Plaintiff LCE is entitled to assert the remedy of termination in response to that breach. · Like the defendants in *Burger King Corp. v. Austin*, Bus. Franchise Guide (CCH), ¶ 9788 (S.D.Fla. December 26, 1990, modified February 22, 1991), the RJL Franchisees have failed to preserve their right to recover for the alleged breaches and continue to use the "Little Caesar" trademark, by ceasing to pay the advertising, royalty and food product fees. The following quote from that case applies with equal force here:

Even assuming the breach of contract claims are adequately pled, Defendants still are unlikely to prevail on Plaintiff's trademark infringement claims. When one party to a contract materially breaches his duties under the contract, the other party may proceed in one of two ways. He can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach. Calamari & Perillo, *Contracts* § 11–37 (1977); Restatement (Second) of Contracts § 236 comment b. As Defendants have ceased paying the amounts due under the franchise and lease agreements, they seem to have chosen the first option of considering BKC's alleged breach a total breach. Thus, Defendants themselves appear to have terminated their contractual relationship with BKC. *See* 4 *Corbin on Contracts* § 946, at 809–10. Although Defendants may prevail on their breach of contract claims, thus excusing them from paying the amounts currently due and perhaps entitling them to further damages, the Court cannot see how this separate cause of action entitles them to continued rights under the franchise agreement.

In order to have preserved their right to recover for the alleged breaches and to continue to use the BKC trademark, Defendants should have continued to pay royalties, advertising expenses and rent.

In *Burger King v. Austin,* the defendants operated two Burger King Franchises in Georgia. The defendants ceased making royalty and advertising payments in July of 1989. Burger King advised the defendants that they were in default and granted them time to cure. Burger King terminated the defendants after they failed to do so. The defendants continued to hold themselves out as Burger King restaurants despite the terminations and their contractual obligation to cease operation upon termination. The defendants claimed that Burger King's termination was wrongful and urged the court to recognize their right to continue operations of the two franchises. As the quoted passage reveals, the district court granted Burger King's motion for a preliminary injunction, finding that the defendants were unlikely to prevail on the plaintiff's trademark infringement claims due to the defendants' material breach of their franchise agreements.

The *Austin* case does differ from this case in that the defendants in that case did not raise the defense of wrongful prevention or hindrance. That distinction however does not render the reasoning of the *Burger King* case inapplicable to the present situation. In this case the RJL Franchisees likewise opted to treat Plaintiffs' alleged breach of the contract; that is, the implementation of price point national advertising without the prior consent of Defendant franchise owners, as a total breach of the contract by ceasing or failing to make the royalty and advertising fees which they were *clearly* required to pay under the express terms of the franchise agreements. The relevant sections state as follows:

X. ROYALTY:

A. In consideration of the continuing right to use the PROPRIETARY MARKS, trade secrets, processes, and knowhow that accompany the LITTLE CAESAR franchise licensed hereunder,

Franchise Owner hereby agrees to pay to LITTLE CAESAR on or before the fifteenth (15) day of each month, a sum equal to five percent (5%) of the gross receipts from the Restaurant for the preceding calendar month.

XII. ADVERTISING:

C. At such time as LITTLE CAESAR develops a nationwide cooperative advertising program, such program will require cooperation of all franchisees; therefore, LITTLE CAESAR reserves the right to require Franchise Owner to participate therein and to impose an additional nationwide cooperative advertising charge up to two percent (2%) of Franchise Owner's monthly gross receipts. In such event, LITTLE CAESAR shall permit Franchise Owner to credit one-half (½) of the additional amount so paid against the amount required to be spent for local and regional advertising under Paragraph B of this Section XII.

With respect to the advertising fees, the Court notes that Defendants rely heavily on Section V.B.6 of the Franchise Agreement for the proposition that it was Defendants' *option* to participate in the national advertising promotion. However it is equally true that Defendants also agreed to the term, Section XII. C, which clearly states that Defendants would be required to participate in a nationwide advertising strategy. The franchise agreement attached to Defendants' Brief is signed by Defendant Frank Lombardo and dated August 28, 1987. As noted by Defendants, the nationwide advertising strategy at issue was not developed until late 1989/early 1990. (*See* Defendants' Amended Verified Counter–Complaint at ¶ 108). Thus Defendants were on notice that such a program might be developed and agreed to participate in it.

If Defendants believed, as they now allege in this case, that they were being kept from profitability by being forced to participate in programs which were not part of their contractual obligation, under the reasoning of the *Austin* case, Defendants should have continued their performance under the contract by making the required

payments and sued Plaintiffs for partial breach. By failing to choose this course of action and ceasing to make the required payments, Defendants in essence treated Plaintiffs' breach as a total breach. Defendants have therefore lost their contractual right to continue to use the "Little Caesar" trademark and the other licensed rights. While Defendants may ultimately prevail on their contract claims, this Court, like the court in *Austin*, cannot see how those separate causes of action entitle Defendants to continued rights under the franchise agreements.

■ The Court notes that Defendants have also raised a number of other claims in their Amended Verified Counter–Complaint including Violation of the Michigan Franchise Investment Law, Mich.Comp. Laws § 445.1501–1546 (Count II); Intentional Interference with Contractual or Business Relationship or Expectancy (Count III); Intentional Misrepresentation (Count IV); and Antitrust (Count V). The Court does not feel it is necessary to separately address these claims since the reasoning just set forth as to Defendants' contract claim applies to these claims as well; namely, if the Defendants believed they had legal claims against LCE as now outlined in the Amended Counter–Complaint, they should have sued on those claims, not stopped making payments on their franchise obligations. Furthermore, Defendants have a damage remedy if they prevail on any of those claims.

■ Further, with respect to the antitrust claim, the Court relies on the United States Supreme Court case of *Monsanto Co. v. SprayRite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); and the Court of Appeals decisions in *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698 (7th Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984); *DeLong Equip. Co. v. Washington Mills Abrasive Company*, 887 F.2d 1499 (11th Cir.1989), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990); and *The Jeanery, Inc. v. James Jeans Inc.*, 849 F.2d 1148 (9th Cir.1988) to support its conclusion that Defendants do

not have a strong likelihood of prevailing on the merits of their claim for vertical price fixing, because there is no evidence which has been submitted of any concerted activity; and, specifically under the holding in the *Jack Walters* case, LCE appears to have acted with a legitimate business justification.

It also seems clear to the Court that here is a likelihood that Plaintiffs will prevail on their trademark infringement claims. The Lanham Act prohibits any person from using any registered mark, without the consent of the registrant, when "such use is likely to cause confusion, or to cause mistake, or to deceive...." 15 U.S.C. § 1114(1)(a). Likelihood of confusion is "[t]he touchstone of trademark law." *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 570 (6th Cir.1987). Furthermore, such confusion may arise when a former franchisee continues to use the franchisor's trademarks after revocation or termination of the franchise agreement. As stated by the Eleventh Circuit in *Burger King v. Mason*, 710 F.2d 1480 (11th Cir.1983) *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984):

> Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks. A patron of a restaurant adorned with the Burger King trademarks undoubtedly would believe that BKC endorses the operation of the restaurant. Consumers automatically would associate the trademark user with the registrant and assume that they are affiliated. Any shortcomings of the franchise therefore would be attributed to BKC. Because of this risk, many courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement.

*Id.* at 1492–93 (citations omitted); *see also General Electric Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir.1989) (following *Burger King Co. v. Mason*, 710 F.2d 1480); *Gorenstein Enterprises, Inc. v. Quality Care–*

*USA, Inc.*, 874 F.2d 431, 434 (7th Cir.1989) (same); *Downtowner/Passport International Hotel v. Norlew, Inc.*, 841 F.2d 214, 219 (8th Cir.1988) (same); *El Greco Leather Products Co. v. Shoe World Inc.*, 806 F.2d 392, 396 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987).

In this case there is no question that Defendants have continued to use LCE's trademark and licensed rights even though LCE terminated them as of March 4, 1992. Defendants admit in their Verified Answer to Verified Complaint that they continue to operate their restaurants as LCE franchises subject to their inability to secure certain supplies from LCE. (*See* Verified Answer, ¶ 24). On the basis of the aforementioned case law, the Court concludes that Plaintiffs have shown that there is a substantial likelihood of success on their trademark infringement claims.

### B. *Irreparable Harm*

■ The next factor the Court must consider is irreparability of harm to the parties. Plaintiffs allege that they have undertaken enormous advertising and marketing expenditures, as well as years of careful planning and supervision to build up the goodwill associated with the "Little Caesar" name and that as long as the RJL Franchisees continue to use LCE's mark, LCE no longer has the right to supervise Defendants' operations to protect that goodwill (*See* Plaintiffs' Brief at 7). Defendants contend that any cessation or change will dissipate and destroy the goodwill that the enterprises have built over the period in question. (*See* Defendants' Brief at 11).

While the Court is mindful that serious consequences will follow whether the preliminary injunctions are granted or denied for either side, the Court believes that Plaintiffs have the stronger position. As held in *Power Test Petroleum Distributors v. Calcu Gas*, 754 F.2d 91 (2d Cir. 1985), irreparable harm exists in a trademark case when the moving party "shows that it will lose control over the reputation of its trademark pending trial." *Id.* at 95 (citing 2 McCarthy, Trademarks and Unfair Competition § 30.15 (2d ed 1984)). Control

of the trademark is critical since a licensor who fails to monitor his trademark risks a determination that it has been abandoned. *Id. See also Gorenstein*, 874 F.2d at 434 ("The owner of a trademark has a duty to ensure the consistency of the trademarked good or service. If he does not fulfill this duty, he forfeits the trademark.") "If a trademark owner allows licensees to depart from its quality [or other] standards, the public will be misled, and the trademark will cease to have utility as an informational device." *Id.* (citation omitted). *See also Church of Scientology International v. The Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir.1986) (quoting *Power Test*). Finally, the Court agrees with the Second Circuit that the unauthorized use of a mark by a former franchisee "invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark;" and consequently, a showing of likelihood of confusion simultaneously demonstrates the requisite irreparable harm necessary to obtain a preliminary injunction. *Church of Scientology*, 794 F.2d at 43. *See also Vision Sports, Inc., v. Melville Corp.*, 888 F.2d 609, 612 (9th Cir.1989) (once the plaintiff establishes likelihood of confusion in a trademark infringement case, presumption exists that the plaintiff will suffer irreparable harm absent the grant of an injunction).

By contrast, Defendants' injuries are clearly compensable by money damages.

### C. *Balance of Hardships*

■ In this case, just as in *Burger King Corp. v. Austin*, the way this Court rules will cause harm to either Plaintiffs or Defendants. If the Court grants the injunction in favor of Plaintiffs, Defendants will be essentially forced out of business and will most likely suffer severe financial hardship. On the other hand, a grant of an injunction in favor of Defendants deprives LCE of its ability to control its trademarked products, and potentially harms the goodwill LCE and LCNAP have earned and built up over a substantial period of time.

On balance the Court feels that the equities tip in favor of Plaintiffs for several

reasons. First, it was Defendants' conduct that effectively terminated the franchise agreements. Second, Defendants' injuries are compensable, Plaintiffs are not. Third, as earlier discussed, the November letter from Defendants to LCE illustrates that LCE has made substantial efforts throughout the course of the parties' relations to help Defendants stay afloat. Thus, the Court finds that this factor also bolsters Plaintiffs' position.

### D. *Public Interest*

As stated in *Church of Scientology*, "[t]he public interest is especially served by issuing a preliminary injunction against a former franchisee as the licensee's status increases the probability of consumer confusion." 794 F.2d at 44. Here, Defendants are maintaining the appearance of Little Caesar restaurants, and the likelihood that those who patronize these establishments will be confused is great. Thus this factor also weighs in Plaintiffs' favor.

### III.

Accordingly, the Court hereby orders that Plaintiffs' Motion for a Preliminary Injunction is GRANTED; and that Defendants' Motion for TRO/Preliminary Injunction is DENIED. The specifics of the Order granting Plaintiffs' motion for preliminary injunction are set forth by separate order. However, with regard to Plaintiffs' requests for a mandatory injunction to prevent Defendants from competing with LCE for a two year period after the effective date of termination and and to prevent Defendants from diverting or attempting to divert business from LCE, the Court holds that there is an insufficient factual record to rule on those issues.