55 F.3d 1171
 34 U.S.P.Q.2d 1840
 MOLTAN COMPANY, Plaintiff/Counter-Defendant-Appellant,
v.
EAGLE-PICHER INDUSTRIES, INC.; Eagle-Picher Minerals, Inc.,
Defendants/Counter-Plaintiffs/Third-Party
Plaintiffs-Appellees,
William M. Gurley, B.J. Gurley, individually and d/b/a
Moltan Company, Third-Party Defendants-Appellants.
 Nos. 94-5345, 94-6472.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 16, 1995.
Decided June 2, 1995.
 
 John D. Horne (argued and briefed), Memphis, TN, for plaintiff-appellant.
 Michael Richards (briefed), Sam B. Blair, Jr. (argued), Baker, Donelson, Bearman & Caldwell, Memphis, TN, for Eagle-Picher Industries, Inc., Eagle-Picher Minerals, Inc.
 John D. Horne, Memphis, TN, for William M. Gurley, B.J. Gurley.
 Before: KENNEDY and DAUGHTREY, Circuit Judges; CLELAND, District Judge.*
 KENNEDY, Circuit Judge.
 
 
 1
 Both Moltan and Eagle-Picher manufacture diatomaceous earth oil absorbent products ("DE products"). In September 1993, Moltan filed suit against Eagle-Picher, accusing it of defamation and commercial disparagement, among other things. Eagle-Picher denied these allegations and filed a counter-claim against Moltan, accusing Moltan of engaging in false advertising and labelling. Eagle-Picher requested that the District Court issue a preliminary injunction ordering Moltan to cease making its allegedly false claims. The District Court issued the injunction, and Moltan appealed.
 
 
 2
 While the appeal was pending, the District Court proceeded with the merits of the litigation, dismissing Moltan's complaint and granting summary judgment in favor of Eagle-Picher on one of the three counts of the counter-claim. The District Court then converted the preliminary injunction into a permanent injunction and scheduled trial on the two remaining counts of the counter-claim. Moltan has also appealed this decision, alleging that the District Court did not have jurisdiction to enter these orders. We vacate the permanent injunction, but affirm the preliminary injunction and the District Court's refusal to require Eagle-Picher to post security.
 
 I.
 
 3
 The Occupational Safety and Health Administration requires that manufacturers and importers of hazardous substances supply information about the dangers associated with a particular product. 29 C.F.R. Sec. 1910.1200. Specifically, manufacturers of products that contain more than .1% of a possible carcinogen must complete Material Safety Data Sheets ("MSDS") and label their products accordingly. Both Eagle-Picher's and Moltan's DE products contain crystalline silica ("CS"). Respirable crystalline silica has been designated a possible carcinogen. Until January 1992, both Moltan and Eagle-Picher determined that they were subject to OSHA's requirements and complied with the procedures.
 
 
 4
 In November 1991, Moltan hired Martin Jensen from the MacKay School of Mines at the University of Nevada, Reno, to evaluate several samples of Moltan's products in an effort to determine whether Moltan still needed to comply with OSHA's requirements. Jensen sent Moltan a report concluding:
 
 
 5
 My personal interpretation of the data is that both your Natural D.E. and Dried D.E. samples contain very little, if any "crystalline silica," either quartz or cristobalite. If they do, the detection limits for these minerals in these low concentrations are below the quantifiable limits of the standard x-ray diffractometer which I operate.
 
 
 6
 Relying on this report, Moltan changed its MSDS, its labelling, and its advertising in January 1992. The new MSDS declared that "X-ray diffraction tests show no measurable amounts of crystalline silica as either quartz or crystobalite." The new labels stated that "Scientific testing of this product has proven that it contains no CRYSTALLINE SILICA, THUS IT IS NOT regulated as an acute or chronic health hazard." Moltan also sent out a letter to its customers stating
 
 
 7
 We are pleased to announce to you that Moltan's Ultrasorb products and now our new Optisorb products have no measurable crystalline silica. Consequently, we believe that these two products, Ultrasorb and Optisorb, are the only two mineral products in our industry that can make this statement. Our MSDS has been revised to reflect this change and the printing on packages now points out the advantage/benefit to the user.
 
 
 8
 Eagle-Picher learned of Moltan's changes soon after they were implemented. Eagle-Picher conducted tests on Moltan's products and discovered that Moltan's products contained more than .1% CS. Eagle-Picher then began an extended campaign of contacting Moltan, OSHA, various state agencies, and Moltan's customers about the allegedly false advertising.
 
 
 9
 In July 1993, Moltan contacted Jensen again and requested further clarification of his results. Jensen apparently conducted new tests and issued a new report to Moltan on July 22. The new report concluded:
 
 
 10
 The results show that all samples do have quartz and cristobalite, that are detectable within the limits of the operation of this apparatus. XRD is not truly a quantitative method, however, we can only state that these minerals are present in each sample. As a very crude approximation, it may be possible to suggest that each of these samples contains perhaps one percent or less of both quartz and crystobalite.
 
 
 11
 In August, Moltan hired Dr. William Miles of Industrial Mineral Research to review Jensen's test results and reports. On August 30, Miles informed Moltan that Jensen's tests were qualitative in nature and were not adequate to distinguish between the presence or absence of CS at a threshold of .1%. Moltan then asked Miles to conduct his own tests. On September 1, 1993, Miles sent Moltan a report stating that CS was present in Moltan's products in quantities ranging from .74% to .93%. Miles also conducted tests to determine the quantity of respirable CS in Moltan's DE products.
 
 
 12
 On September 3, 1993, Moltan filed a complaint in the District Court, accusing Eagle-Picher of defamation, commercial disparagement, interference with contract, and interference with prospective economic advantage. These charges all stem from Eagle-Picher's activities in notifying various companies and agencies about Moltan's alleged mislabelling. Eagle-Picher denied the allegations and counter-claimed, accusing Moltan of false advertising under the Lanham Act, of violating the Tennessee Consumer Protection Act, and of common law unfair competition. Eagle-Picher sought a preliminary injunction, which was issued by the District Court, and Moltan appealed.
 
 
 13
 While that appeal was pending, the District Court continued with the merits of the litigation. In response to motions filed by Eagle-Picher, the District Court dismissed one count of Moltan's complaint and granted summary judgment in favor of Eagle-Picher on the other counts. The court then granted summary judgment in favor of Eagle-Picher on its allegation that Moltan had violated the Lanham Act and scheduled trial on the remaining two counts of the counter-claim. The District Court also converted the preliminary injunction to a permanent one. Moltan also appealed these decisions, and we consolidated the two appeals.
 
 II.
 A. Permanent Injunction
 
 14
 Moltan appeals the District Court's decision to convert the preliminary injunction into a permanent one, contending that its appeal of the preliminary injunction deprived the District Court of jurisdiction to enter that order. We disagree.
 
 
 15
 It is well established that "an appeal from an order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the action on the merits." 9 M. Moore, B. Ward & J. Lucas, MOORE'S FEDERAL PRACTICE p 203.11, at 3-54 (2d ed. 1989). We recognized this authority in Weaver v. University of Cincinnati where we stated:
 
 
 16
 Ordinarily, the district court is divested of jurisdiction in a case when one or more of the parties files a notice of appeal. There is authority, however, which holds that an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue deciding other issues in the case.
 
 
 17
 970 F.2d 1523, 1528-29 (6th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1274, 122 L.Ed.2d 668 (1993); see also Branham v. Spurgis, 720 F.Supp. 605, 607 n. 2 (W.D.Mich.1989), appeal dismissed, 889 F.2d 1086 (6th Cir.1989).
 
 
 18
 The District Court thus had jurisdiction to continue with the merits of the litigation while the appeal from the preliminary injunction was pending. It did not, however, have authority to enter the permanent injunction prior to trial. An evidentiary hearing is ordinarily required prior to the issuance of a permanent injunction. United States v. McGee, 714 F.2d 607, 613 (6th Cir.1983). We have held that no such hearing is required if no factual issues remain for trial, id., and on first glance that ruling would appear to be applicable here, since the District Court issued the permanent injunction after granting summary judgment in favor of Eagle-Picher. This summary judgment was not complete, however. Two counts remained in the counter-claim, counts on which Eagle-Picher sought legal, as opposed to equitable, relief. Accordingly, these issues were to be resolved by a jury.
 
 
 19
 These remaining claims involved factual issues that overlapped with Eagle-Picher's Lanham Act claim. When both legal and equitable issues are presented in a single case, a jury should determine the issues common to both claims. Perez-Serrano v. DeLeon-Velez, 868 F.2d 30 (1st Cir.1989); Moore v. Sun Oil Co., 636 F.2d 154 (6th Cir.1980). "It is well settled that where claims at law and in equity are joined and the legal claims are tried separately by a jury, the jury's verdict operates as a finding of fact binding on the trial court in its determination of the equitable claims." Dybczak v. Tuskegee Institute, 737 F.2d 1524, 1526-27 (11th Cir.1984), cert. denied, 469 U.S. 1211, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985). With these principles in mind, the District Court should have waited until after trial to make the factual findings necessary for the issuance of the permanent injunction. We must therefore vacate that injunction, as it was premature.
 
 B. Preliminary Injunction
 
 20
 Having vacated the permanent injunction, we now turn to an examination of the preliminary injunction. We look to four factors in judging the propriety of a preliminary injunction: 1) the likelihood of Eagle-Picher's success on the merits; 2) whether the injunction will save Eagle-Picher from irreparable injury; 3) whether the injunction would harm others; and 4) whether the public interest would be served. International Longshoremen's Assoc. v. Norfolk Southern Corp., 927 F.2d 900, 903 (6th Cir.), cert. denied, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991). We review the District Court's decision for an abuse of discretion; we will reverse a district court's weighing and balancing of the equities only in the rarest of circumstances. In re Eagle-Picher Industries, 963 F.2d 855, 858 (6th Cir.1992).
 
 
 21
 In issuing the preliminary injunction, the District Court made written findings of fact and conclusions of law. With respect to the first factor, the District Court found that Eagle-Picher had clearly established that it was likely to succeed on the merits of its Lanham Act claim. The court found that the weight of the expert evidence demonstrated that Moltan's DE Products contained more than .1% CS, and consequently, Moltan's advertising and labelling contained false and misleading information. The District Court also found that Eagle-Picher was suffering irreparable injury because Moltan's false claims were causing Eagle-Picher to lose sales and market share. Finally, the court concluded that no harm would occur to Moltan as a result of complying with the applicable labelling requirements and that an injunction would serve the public interest, as it would prevent workers from unknowingly being exposed to a possible carcinogen.
 
 
 22
 Moltan's primary challenge to the District Court's issuance of the preliminary injunction revolves around the difference between CS and respirable CS. All the experts agree that Moltan must label its products with warnings if they contain more than .1% of a possible carcinogen. The experts also agree that the amount of the carcinogen present should be measured using a method called bulk sample analysis by weight. OSHA's regulations also establish which sources a manufacturer should reference in determining whether any of its ingredients constitute a possible carcinogen. The dispute is over whether the relevant possible carcinogen is CS or respirable CS.
 
 
 23
 We should first note that the evidence presented to the District Court on this issue was not entirely clear. The evidence showed that until the fall of 1993, both Eagle-Picher and Moltan tested their products for the presence of CS, not for respirable CS. The parties had also labelled their products and completed the MSDS on this basis. The first test for respirable CS came in the fall of 1993, when Moltan asked Miles to perform the test.
 
 
 24
 OSHA directs manufacturers to three sources to determine whether any of its chemical compounds are a carcinogen. Two of these sources list only respirable CS, not CS in all its forms. The evidence with respect to the third source is conflicting; at one point the record indicates that the source referred to respirable CS, and at another point a witness indicated that the source simply listed CS.
 
 
 25
 We do not need to decide this issue.[1] The District Court granted the preliminary injunction because it determined that Eagle-Picher had demonstrated a likelihood of success on its false labelling and false advertising claim. When Moltan changed its labelling and MSDS in January 1992, it announced that its DE products contained no measurable quantities of CS, not that they contained no measurable quantities of respirable CS. Even Moltan's experts agree this claim was false.
 
 
 26
 Moltan next attacks the District Court's findings regarding irreparable harm. According to Moltan, laches bars Eagle-Picher's request for an injunction, as Eagle-Picher learned of Moltan's changes in January 1992 and did not file its counter claim until late 1993. This argument is meritless because Eagle-Picher did not "sit" on its rights for the intervening time period. Instead, Eagle-Picher actively sought to correct Moltan's misleading claims by discussing the issue with Moltan, by filing complaints with OSHA and various state agencies, and by contacting Moltan's customers. We will not penalize Eagle-Picher for attempting to use other avenues to resolve this dispute.
 
 
 27
 Finally, Moltan claims that the District Court erred in holding that an injunction would serve the public interest. According to Moltan, Eagle-Picher is seeking to protect its own market share, not the public welfare. In this instance, Eagle-Picher's motives are irrelevant. The District Court found sufficient evidence to believe that Moltan was mislabelling its DE products. This deficiency meant that many workers were not on notice regarding the need to take precautions when using Moltan's products. Thus, an injunction would protect these members of the public.
 
 
 28
 After reviewing the District Court's opinion and Moltan's challenges, we cannot say that the District Court abused its discretion in issuing the preliminary injunction. Accordingly, we decline Moltan's request to vacate that injunction.
 
 C. Security Requirement
 
 29
 The Federal Rules of Civil Procedures declare that
 
 
 30
 No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained....
 
 
 31
 Fed.R.Civ.P. 65(c). In issuing the preliminary injunction, the District Court refused to require that Eagle-Picher post security. According to the lower court, no security was needed because of the strength of Eagle-Picher's case and the strong public interest involved. Moltan argues that the District Court erred in not requiring Eagle-Picher to post a bond.
 
 
 32
 While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security. Roth v. Bank of the Commonwealth, 583 F.2d 527, 539 (6th Cir.1978), cert. denied, 440 U.S. 944, 99 S.Ct. 1420, 59 L.Ed.2d 632 (1979); Urbain v. Knapp Bros. Manuf. Co., 217 F.2d 810, 815-16 (6th Cir.1954), cert. denied, 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed. 1260 (1955). We cannot overturn the prior published decision of another panel and are therefore bound by these previous decisions. Accordingly, we conclude that the District Court did not err in waiving the security requirement.
 
 III.
 
 33
 For the foregoing reasons, we AFFIRM the District Court's issuance of the preliminary injunction and its decision not to require that Eagle-Picher post security. We do, however, VACATE the permanent injunction and REMAND for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Eagle-Picher has argued that this dispute is moot because Miles' tests from the fall of 1993 show that Moltan's products contain more than .1% of respirable CS. Moltan disputes this characterization. Due to the heavily excerpted transcript provided to us by the parties, we are unable to resolve this dispute. Accordingly, we will not rely on Miles' test results regarding respirable CS