JACK ZOUHARY, U.S. DISTRICT JUDGE
INTRODUCTION
Pending before this Court are cross-motions for preliminary injunction. Plaintiffs are the franchising and trademark arms of the Marco's Pizza organization (Marco's). Defendants are former Marco's franchisee companies and owners (Soham) who operated five Marco's Pizza restaurants in Florida. Marco's terminated Soham's Franchise Agreements and licenses to use its trademarks after Soham did not install designated computer systems that Marco's required in its restaurants. Soham continued operating after termination, and Marco's brought this lawsuit (Doc. 1). Soham counterclaimed, alleging breach of contract (Doc. 11).
Marco's moves for a preliminary injunction (Doc. 7), asking this Court to prevent Soham from continuing to operate under Marco's trademarks; Soham opposes (Doc. 31). Soham, too, moves for a preliminary injunction (Doc. 31), asking this Court to prevent Marco's from cutting Soham off from its suppliers; Marco's opposes (Doc. 34). This Court held a Record Hearing on March 1, 2019, to hear argument on the Motions.
BACKGROUND
Marco's is in the business of franchising pizza restaurants. Over the past forty years, Marco's has operated under federally registered trademarks and has allowed its franchisees to use these trademarks under franchise agreements (Doc. 7-1 at 8). Today, Marco's has over a dozen trademarks, including "Marco's Pizza," "Marco's," and other terms related to its menu items or advertising (id. at 9).
Soham first became a Marco's franchisee in 2010, when Soham executed its first *894 Franchise Agreement with Marco's and opened a Marco's Pizza restaurant in Zephyrhills, Florida (Doc. 31 at 3). Over the next several years, Soham opened a total of five Marco's Pizza restaurants (Doc. 8 at 3). Soham and Marco's executed written Franchise Agreements for three of the restaurants. The other two operated without separate written agreements but with an "understanding" that those restaurants "would operate ... pursuant to the Marco's system" (Doc. 31 at 12).
Soham's five restaurants, like all Marco's Pizza restaurants in the United States, use a point-of-sale (POS) computer system to process orders. Until January 2018, Marco's allowed its franchisees to use POS systems from either of two approved vendors -- Pyrimont Operating Solutions or FoodTec Solutions (Doc. 7 at 4-5). But in January 2018, Marco's selected FoodTec as the exclusive POS system provider. Marco's announced to its franchisees that restaurants using the Pyrimont system had to convert to the FoodTec system by October 2018 (id. at 5). Soham did not change systems.
On October 1, 2018, Soham's five restaurants were among a handful of Marco's Pizza restaurants that had not yet converted to the FoodTec system. On October 4, 2018, Marco's sent Soham Notices of Deficiency, demanding that Soham install the FoodTec system by October 21, 2018 (Doc. 1-5). Soham still did not comply.
On October 25, 2018, Marco's sent Soham Notices of Default (Doc. 1-6). In these Notices, Marco's formally invoked defaults under the Franchise Agreements and demanded that Soham cure the defaults by November 30, 2018. The Notices warned that failure to change systems by November 30 would result in termination of the Franchise Agreements (id. ). Again, Soham refused. On January 9, 2019, Marco's sent Soham Notices of Termination (Doc. 1-7), terminating the Franchise Agreements and licenses to use the Marco's trademarks.
Despite termination, Soham continues to use the trademarks and to hold out its restaurants as authorized Marco's Pizza franchises. As of February 12, 2019, the date Marco's filed this lawsuit, there were only seven Marco's restaurants in the United States that had not converted to the FoodTec POS system -- two restaurants that are scheduled to permanently close soon and Soham's five restaurants (Doc. 7-1 at 7-8). Soham now claims the Franchise Agreements do not require it to replace its POS system. Both parties move for preliminary injunction (Docs. 7, 31).
DISCUSSION
To determine whether to grant or deny a preliminary injunction, this Court considers four factors:
(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.
Ne. Ohio Coal. for Homeless v. Husted , 696 F.3d 580, 590-91 (6th Cir. 2012) (citation omitted). "In the trademark context, the first factor is often decisive." PGP, LLC v. TPII, LLC , 734 F. App'x 330, 332 (6th Cir. 2018). "If the movant is likely to succeed on an infringement claim, irreparable injury is ordinarily presumed, and the public interest will usually favor injunctive relief." Id. (citing Wynn Oil Co. v. Am. Way Serv. Corp. , 943 F.2d 595, 608 (6th Cir. 1991) ).
To succeed on the merits of its trademark-infringement claim, Marco's must prove three elements: (1) Marco's owns the registered trademark; (2) Soham used the mark in commerce; and (3) Soham's *895 use was likely to cause confusion. Hensley Mfg. v. ProPride, Inc. , 579 F.3d 603, 609 (6th Cir. 2009).
Here, the dispute is limited to the third element, although Soham makes a passing swipe at the first (see Doc. 31 at 13). Soham alleges Marco's does not own its federally-registered trademarks because it abandoned them by allowing franchisees to operate without agreements in writing. But abandonment of a trademark does not turn on whether a franchisor consistently uses written agreements. Instead, it turns on whether the franchisor "sufficiently policed and inspected its licensees' operations to guarantee the quality of the products they sold under its trademarks to the public." Dawn Donut Co. v. Hart's Food Stores, Inc. , 267 F.2d 358, 367 (2d Cir. 1959). Soham bears the burden of proof to show this lack of policing, Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc. , 289 F.3d 589, 596 (9th Cir. 2002), yet cites no supporting evidence. Indeed, the announcements and notices about the POS system, as well as the filing of this lawsuit, suggest that Marco's enforces its standards and exercises considerable control over its trademarks. Soham fails to meet its burden to show abandonment.
The second element is not in dispute, as Soham admits that it continues to use Marco's trademarks in its restaurants (see Doc. 8 at 2).
Now for the third element -- likelihood of confusion. A plaintiff can establish "likelihood of confusion" by showing "proof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated." U.S. Structures, Inc. v. J.P. Structures, Inc. , 130 F.3d 1185, 1190 (6th Cir. 1997). See also Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n , 110 F.3d 318, 333 (6th Cir. 1997) ("[T]he unauthorized use of a mark by a former licensee is particularly likely to cause consumer confusion."). In the context of a franchisor-franchisee relationship, a franchisor can establish likelihood of confusion by proving a franchisee to be a "holdover franchisee" -- one who was properly terminated but continues to operate using the franchisor's marks and logos. See Dunkin' Donuts Franchised Restaurants LLC v. N. Thakkar, Inc. , 2009 WL 10679563, at *4 (S.D. Ohio 2009) (internal quotation marks omitted). See also S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 375 (3d Cir. 1992) (finding a considerable likelihood of confusion when an infringer uses the exact trademark as the franchisor).
Here, the parties disagree on whether Soham's continued use of Marco's trademarks is, in fact, unauthorized. To show lack of authorization, Marco's must demonstrate that it "properly terminated the contract purporting to authorize the trademarks' use." McDonald's Corp. v. Robertson , 147 F.3d 1301, 1308 (11th Cir. 1998). See also Little Caesar Enterprises, Inc. v. R-J-L Foods, Inc. , 796 F.Supp. 1026, 1030 (E.D. Mich. 1992) (framing trademark dispute between franchisor and terminated franchisee around whether franchisor properly terminated franchise agreement); Papa John's Int'l, Inc. v. Specktacular Pizza, Inc. , 2005 WL 3132337, at *3 (W.D. Ky. 2005) (same).
Although both parties move for preliminary injunction under different claims -- Marco's under trademark infringement and Soham under breach of contract -- the likelihood of success of their respective claims are inversely related. If Marco's trademark-infringement claim is likely to succeed, then Soham's breach-of-contract claim must be unlikely to succeed, and vis versa. Thus, the likelihood of success of both claims hinges on the breach-of-contract question: whether Marco's properly terminated the Franchise Agreements. McDonald's Corp. , 147 F.3d at 1308.
*896 First, because only three out of the five Soham stores had separate written Franchise Agreements, this Court must resolve what terms governed each of the Soham franchises. Ohio law does not require that all contracts have a separate writing. See Fenix Enterprises, Inc. v. M & M Mortg. Corp. , 624 F.Supp.2d 834, 841-42 (S.D. Ohio 2009). "Terms of an oral contract may be determined from 'words, deeds, acts, and silence of the parties.' " Res. Title Agency, Inc. v. Morreale Real Estate Servs., Inc. , 314 F.Supp.2d 763, 769 (N.D. Ohio 2004) (quoting Kostelnik v. Helper , 96 Ohio St. 3d 1, 3, 770 N.E.2d 58 (2002) ).
Soham's Dania Beach and Hallandale locations are the two without separate writings. Like all Soham's restaurants, these locations are operated by separate LLCs -- Soham Dania Beach, LLC and Soham Hallandale, LLC, respectively. Although these companies did not execute separate written agreements with Marco's, Soham admits that the "understanding was that Soham Dania Beach, LLC and Soham Hallandale, LLC would operate their franchises pursuant to the Marco's system" (Doc. 31 at 12). By the time those locations opened, Soham had already executed written Franchise Agreements for other stores. Although there are some minor variations in wording, the terms of those Franchise Agreements are functionally the same for Soham's other stores (see Docs. 1-1, 1-2, 1-3). Neither party asserts that Marco's or Soham treated the Dania Beach or Hallandale locations differently from the others. The words, deeds, and acts of the parties demonstrate that operating "pursuant to the Marco's system" means operating under the terms of the Marco's Franchise Agreements. Thus, the terms of the written Franchise Agreements govern the contractual relationship with all five stores.
So what do the Franchise Agreements say about termination? Section 19.4 provides (Doc. 1-1 at 44):
Franchisor shall have the right ... to terminate this Agreement by giving written notice of termination ... setting forth the nature of such default to Franchisee ... at least thirty (30) days before the effective date of termination .... If any such default is not cured within the specified time, ... this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of ... the 30-day period.
Marco's complied with these requirements. As noted above, Marco's sent Notices of Deficiency on October 4, 2018 (Doc. 1-5), and formal Notices of Default on October 25, 2018 (Doc. 1-6). These Notices clearly stated the nature of the default -- Soham's failure to convert POS systems (Docs. 1-5, 1-6). The Notices of Default gave Soham 36 days -- until November 30, 2018 -- to cure the default by installing the FoodTec system (Doc. 1-6). During that time, the parties held discussions with no progress (Hrg. Tr. at 13-15, 18-20). Marco's did not terminate the Agreements until January 9, 2019. Marco's provided Soham with more than 30 days to cure its default before termination.
Soham rebuts, saying that there was never any default in the first place (Doc. 31 at 10). Soham alleges -- for the first time in briefing -- that it was never under any contractual obligation to replace its existing POS system (see id. at 7-10). But Soham is swimming upstream against several provisions of the Franchise Agreements. For instance (Doc. 1-1 at 31-34) (emphasis omitted):
13.7.1 [Marco's has] the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, and hardware *897 to be used by, between, or among Stores, including without limitation: (a) back office and point of sale systems ... (b) Cash Register Systems ... (collectively, the "Computer System").
13.7.3 [Soham] must install and use the Computer System and Required Software in the manner required by Franchisor.
13.11 [Soham] must record all sales on computer-based point of sale systems approved by Franchisor or on such other types of cash registers as may be designated by Franchisor .... [Soham] must utilize computer-based POS Systems which are fully compatible with ... any other program or system which Franchisor, in its discretion, may employ ....
Section 13.7.1 provides that Marco's has the right to require that Soham use "certain brands, types, makes, and/or models" for its computer equipment, including its POS system (id. at 31). Under Section 13.7.3, Soham must "install and use" that system in the manner Marco's requires (id. at 32). And Section 13.11 states Soham must record all sales on POS systems "approved by" or "designated by" Marco's (id. at 33-34). These provisions indicate that Marco's can reasonably dictate a particular POS system.
Soham cites other provisions to argue that, once an allowable POS system has been installed, Marco's only has the right to require it to upgrade that system, not to replace the system. Soham relies on the following provisions (id. at 32) (emphasis omitted):
13.7.4 [Soham] must implement and periodically make upgrades and other changes to the Computer System and Required Software as [Marco's] may reasonably request in writing (collectively, "Computer Upgrades").
13.7.5 [Soham] must comply with all specifications issued by Franchisor with respect to the Computer System and the Required Software, and with respect to Computer Upgrades, at [Soham's] expense.
Soham argues that the Agreements do not govern "replacements of POS systems ... [r]ather the language expressly governs upgrades ." (Doc. 31 at 7) (emphasis in original). Soham stresses that the term "upgrade" cannot mean "replace" (see Hrg. Tr. at 31-32).
The problems with this argument are several. First, this argument disregards the definition of Computer Upgrades in the contract. Section 13.7.4 defines Computer Upgrades as "upgrades and other changes to the Computer System" (Doc. 1-1 at 32) (emphasis added). If replacing the POS system does not fall under "upgrades," it seems to fall under the broader term "other changes." Second, Soham's argument ignores the common dictionary definition of the word "upgrade." See Clark v. Walt Disney Co. , 642 F.Supp.2d 775, 782 (S.D. Ohio 2009) ("[A]s a general rule, courts may consult a dictionary at any stage of the litigation to determine the meaning of words and phrases."). As used in Section 13.7.4, the term "upgrades" is used as a noun. The Oxford English Dictionary defines the noun form of upgrade by using the verb form -- the "act of upgrading something." Upgrade , OXFORD DICTIONARIES ONLINE , https://en.oxforddictionaries.com/definition/upgrade (last visited March 4, 2019). That dictionary defines the verb form of upgrade as to "[r]aise (something) to a higher standard, in particular improve (equipment or machinery) by adding or replacing components." Id. (emphasis added). The Merriam-Webster unabridged dictionary instructs that, when used as an intransitive verb, "upgrade" means "to replace something (such as software or an electronic device) with a more useful version or alternative." Upgrade , MERRIAM-WEBSTER
*898 ONLINE DICTIONARY , https://www.merriam-webster.com/dictionary/upgrade (last visited March 4, 2019) (emphasis added). The gist of these definitions is this: not all upgrades amount to replacements, but some do.
Soham makes several attempts to bolster its argument, but these attempts fall flat. First, Soham cites several other portions of the Agreements to show that they use the word "replace" elsewhere but not in Sections 13.7.4 and 13.7.5 (see Doc. 31 at 8). From this evidence, Soham argues, if Marco's meant to say "replacements," Marco's knew how to say it. But the provisions Soham cites do not use the term "replace" and "upgrade" together. They do not suggest how those two words relate to one another or suggest that an upgrade cannot include a replacement.
Next, Soham cites to the deposition of April Cooper, a leader of Marco's IT team, to show that even a member of the Marco's team distinguishes the terms upgrade and replace. Soham cites the following portion of the deposition (Doc. 33-1 at 10):
Q: So rather than merely upgrading it, you had to replace it?
A: Correct.
Q: Okay. And is it the same thing -- is the same thing true of the equipment, the hardware? You couldn't upgrade the hardware either; you had to replace it?
A: Correct.
But elsewhere in the same deposition, Cooper uses the terms replace and upgrade interchangeably (id. at 9) (emphasis added):
Q: Is there anything else that needed to be replaced in connection with the conversion?
A: Internet cables.
Q: Why?
A: If the store was an older store, we had site surveys done in order to have all the cablings checked to make sure that they were upgraded ....
Contrary to Soham's reason for citing the deposition, this testimony reinforces the fact that not all upgrades are replacements, but some are.
Finally, Soham relies on two cases, which are likewise of no help. First, Soham cites Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC , 312 F.Supp.3d 1325 (S.D. Fla. 2018). There, in a case similar to this one, the court held that the franchisee breached the franchise agreement by failing to replace its POS system as the franchisor directed. The relevant contractual provision specifically stated "replace or upgrade" instead of just upgrade. Id. at 1335. But the more specific contractual language of another, unrelated franchise agreement does nothing to alter the language in the Franchise Agreements here. Peterbrooke says nothing about whether the term "upgrade" alone encompasses the possibility of replacement.
Soham also cites McHugh v. DLT Sols., Inc. , 618 F.3d 1375 (Fed. Cir. 2010) for the proposition that "replace" and "upgrade" have two different meanings. There, a contract between a government agency and a software contractor prohibited the agency from replacing software leased from the contractor. But instead of installing the leased software, the agency upgraded software that it already had and cancelled the leasing contract. The court held that the agency had not "replaced" the leased software, it had only made minor upgrades to previously installed software. Id. at 1381.
But McHugh suggests that an upgrade, when substantial enough, can amount to a replacement. The McHugh court specified that "the upgrade here was not carried out with an eye toward replacing the [leased] software." Id. Recognizing the two terms could overlap, the court stated *899 that "such an insubstantial upgrade cannot reasonably constitute a replacement of the contracted-for software." Id. If an insubstantial upgrade cannot constitute a replacement, then a more substantial upgrade could constitute a replacement.
These cases -- like the deposition testimony, the dictionary definitions, and the plain language of the Agreements -- all lead to the same conclusion: a requirement to upgrade includes a requirement to replace. Although some upgrades are minor, other, more substantial upgrades can amount to replacements. As Plaintiffs' counsel put it at the Record Hearing, "If you upgrade your iPhone from an iPhone 6 to an iPhone 8, you get a new phone .... If I upgrade my Pinto to a Cadillac, I'm changing it out ...." (Hrg. Tr. at 33). The contract requirement that Soham "make upgrades" encompasses those more substantial upgrades that involve replacing the old with the new.
Under the terms of the contract, Soham was required to obey Marco's reasonable requests for replacing the POS system. Marco's gave Soham over a year to comply; Soham failed to do so. Soham materially breached the Agreements, and Marco's acted within its rights when it terminated the Agreements. Thus, Marco's terminated the Franchise Agreements properly, and Soham's continued use of the Marco's trademarks is unauthorized. This showing of continued, unauthorized use is sufficient to show likelihood of confusion.
Having satisfied all three elements of its trademark-infringement claim, Marco's has demonstrated a likelihood of success on the merits and meets the first of the preliminary injunction factors. And as discussed above, in the trademark-infringement context, this first factor is decisive because it effectively resolves the others. See PGP, LLC , 734 F. App'x at 332. See also Wynn Oil Co. , 943 F.2d at 608 ("[I]rreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values.") (internal quotation marks and citation omitted); Little Caesar Enterprises, Inc. , 796 F.Supp. at 1030 (stating that the balance of hardships favors franchisor over terminated franchisee because franchisee's injuries are compensable while franchisors' potential injury to its goodwill is not); Church of Scientology Int'l v. Elmira Mission of the Church of Scientology , 794 F.2d 38, 44 (2d Cir. 1986) ("[T]he public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's [holdover] status increases the probability of consumer confusion."). Thus, the four preliminary injunction factors favor Marco's.
If an injunction is to be issued in favor of Marco's, then Soham requests that Marco's post a bond to compensate Soham if Soham is ultimately found to have been wrongfully enjoined (Doc. 31 at 17). See also Federal Civil Rule 65(c). In the Sixth Circuit, "the district court possesses discretion over whether to require the posting of security" and over the amount of that security. Moltan Co. v. Eagle-Picher Indus., Inc. , 55 F.3d 1171, 1176 (6th Cir. 1995). See also Federal Civil Rule 65(c). When determining whether to require a bond, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present. See Moltan , 55 F.3d at 1176.
Here, this Court asked the parties at the Record Hearing whether there should be a bond and in what amount (Hrg. Tr. at 45). Soham noted that an injunction would mean the certain closure of its restaurants and asked that the bond exceed $ 300,000 (id. at 47). Marco's offered a range of $ 50,000 to $ 100,000 as appropriate (id. ). This Court finds that the strength of Marco's *900 case favors a bond in the modest amount of $ 75,000.
CONCLUSION
Marco's Motion for Preliminary Injunction (Doc. 7) is granted. Soham's Cross-Motion for Preliminary Injunction (Doc. 31) is denied. Soham is enjoined from continuing to use the Marco's trademarks or holding out its restaurants as authorized Marco's franchises. Marco's shall post a bond in the amount of $ 75,000. The Clerk shall accept and deposit the bond into the registry of this Court. The Clerk shall promptly and properly invest those funds into Government Accounting Series securities through the Court Registry Investment System and deduct a registry fee as a percentage of the income earned on the investment over the period such sums remain deposited and invested, not to exceed ten percent (10%).
IT IS SO ORDERED.