NOT RECOMMENDED FOR PUBLICATION

File Name: 25a0594n.06

No. 24-5944

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Dec 19, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| MICHAEL HARRIS, | ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: BOGGS, BUSH, and READLER, Circuit Judges.

BOGGS, Circuit Judge. Following a traffic stop and a search of his vehicle that uncovered drugs and guns, Michael Harris was charged with drug trafficking and firearms offenses. After the district court denied his motion to suppress, Harris pleaded guilty to possession with intent to distribute of fifty grams or more of methamphetamine and being a felon in possession of firearms and ammunition. Harris retained his right to appeal the denial of his motion to suppress, which he now does. For the following reasons, we affirm.

**I**

On April 24, 2022, the Knox County Sheriff's Office ("KCSO"), Knoxville Police Department ("KPD"), and Bureau of Alcohol, Tobacco, and Firearms ran a joint surveillance operation to detect illegal firearm sales at a gun show in the Knoxville Expo Center. Undercover officers observed a man walking from booth to booth, displaying and describing various firearms to someone over FaceTime on his cell phone. Viewing this behavior as indicative of a potential

illicit straw purchase, police took greater interest. After the man made numerous purchases and left the gun show, officers began to follow him in hopes of observing a traffic violation and making a pretextual stop. They also ran his van's out-of-state plates, which revealed that it was a rental.

The van then turned into a Popeyes restaurant. In the radio transmissions among the officers, at least one detective reported seeing the van pull into the drive-through and leave with food. KCSO Detective Marcus Parton, however, observed only that the vehicle entered and exited the Popeyes before continuing in the same direction. He thus concluded that Harris's Popeyes detour was a "heat check"—a countersurveillance technique meant to detect whether law enforcement was tailing him.

Detective Parton followed the van to an intersection with a designated straight-only lane (through-lane) and a designated left-turn lane. According to Detective Parton, who was pulled up behind the van in the through-lane, the van "immediately and abruptly turned left" from the through-lane when the light turned green; that is, it "cut across" the left-turn lane to enter the cross street. Detective Parton then radioed that the vehicle had made an illegal turn, prompting two KPD officers to follow the van to a gas station and conduct a traffic stop. When officers approached the vehicle, they discovered Harris in the driver's seat; there was also a passenger in the vehicle. One officer smelled what he believed to be the odor of burnt marijuana emanating from the van's open window. Based on that odor, he informed Harris that he planned to search the van. When questioned, Harris admitted that he and his passenger had probably smoked marijuana the previous day. The officer instructed Harris to exit the van for a frisk. Both officers then began to search the van, finding three wads of cash, two cell phones, a marijuana grinder, ammunition, firearms, firearm accessories, and a pink suitcase. When one of the officers began to search the suitcase, Harris got back in the van, fled the scene of the stop, and

2

promptly crashed into two other vehicles.  The officer completed the search of the suitcase at the scene of the crash, finding almost a kilogram of methamphetamine. Harris was charged in federal court with possession with intent to distribute of fifty grams or more of methamphetamine, possession of firearms in furtherance of a drug-trafficking offense, and being a felon in possession of firearms and ammunition.

Harris moved to suppress the evidence seized pursuant to the traffic stop and related search.  He argued that (1) officers had neither reasonable suspicion of criminal activity nor probable cause of a traffic violation to justify the stop and (2) the officers lacked probable cause to search the vehicle.  The district court denied that motion.  Harris now appeals.

## II

"When a defendant appeals the denial of a motion to suppress evidence, we review the district court's findings of fact under the clear-error standard[,] and we review its conclusions of law de novo."  *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019).  "A factual finding will only be clearly erroneous when, although there may be evidence to support it," we are "left with the definite and firm conviction" that the district court made a mistake.  *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).  In addition, when the district court denies a motion to suppress, "we review all evidence in the light most favorable to the government."  *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009).

## A

The Fourth Amendment protects the right of the people to be free from "unreasonable searches and seizures."   U.S. Const. amend. IV.  Warrantless searches and seizures "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967).  As pertinent here,

an officer may conduct a warrantless traffic stop when there is "probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).

It was not error for the district court to credit Detective Parton's testimony and find probable cause to believe that a traffic violation had occurred. At the suppression hearing, Detective Parton testified that he witnessed Harris make an immediate left turn from a designated straight-only lane, in violation of Tenn. Code Ann. § 55-8-140(5)(a). That provision states: "Where a special lane for making left turns . . . has been established[, a] left turn shall not be made from any other lane unless a vehicle cannot safely enter the turn lane[.]" Tenn. Code Ann. § 55-8-140(5)(a). Harris's conduct thus falls squarely within the plain text of the statute. As for the unsafe-entry exception, Detective Parton claimed that, to the best of his knowledge, no other cars were in the left-turn lane. We agree with the district court that "[s]uch testimony indicates that defendant could have safely entered the designated turn lane when the light turned green but did not do so." Further, because Detective Parton informed the responding officers that Harris had made an illegal turn, his personal knowledge and level of suspicion is properly imputed to them. *See, e.g.*, *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) (explaining the "well-established" rule that officers are presumed to have collective knowledge). Harris provides no evidence to undermine Detective Parton's testimony other than his own contentions on appeal.[1] Hence, the district court did not err in finding probable cause sufficient to justify the stop.

---

[1] Harris insists that "reasonable minds could interpret [Detective Parton's] testimony differently," and that one such interpretation is that Harris did in fact enter the left-turn lane before turning. First, any such ambiguity would redound to the government's benefit, since we view the evidence in the light most favorable to it. *See Gunter*, 551 F.3d at 479. Second, Harris's argument appears to rest on his misunderstanding of Detective Parton's statement that "we weren't so far back from the light that you couldn't make your way to the turn lane." But this is merely a clarification of his preceding sentence that "we were within the area to be in the turn lane." In other words, Detective Parton meant that *before* stopping, the vehicles were already within the stretch of roadway where entry into the left-turn lane would have been lawful—not that, *after* stopping, there remained enough space to maneuver into the lane such that "cut[ting] across" it (in Detective Parton's words) described lawful travel within it. Indeed, he testified that Harris's vehicle stopped "pretty close up to the white line at the red light."

**B**

Harris next contends that burnt marijuana smells the same as burnt hemp, which is legal; thus, marijuana odor alone did not provide probable cause to search his vehicle. A different panel of this court rejected that argument in *United States v. Santiago*, 139 F.4th 570, 575 (6th Cir. 2025). In that case, the arresting officers' testimony that they had never encountered anyone smoking hemp supported the panel's conclusion that, to a "reasonable officer," a marijuana-like odor is so likely to indicate marijuana that it establishes probable cause. *Ibid.* Furthermore, while that case concerned probable cause for an arrest, the court was clear that in both the search and arrest contexts, police have probable cause to believe "that marijuana is present where they smell it." *Ibid.* at 574. We are, of course, bound by the decisions of prior panels. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

**III**

For the foregoing reasons, we **AFFIRM** the district court's denial of Harris's motion to suppress and his ensuing conviction.